People v Pietoso (2019 NY Slip Op 00498)





People v Pietoso


2019 NY Slip Op 00498


Decided on January 24, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: January 24, 2019

108470

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
MICHAEL A. PIETOSO, Appellant.

Calendar Date: December 12, 2018

Before: Lynch, J.P., Clark, Mulvey, Devine and Rumsey, JJ.


Thomas H. Kheel, Ithaca, for appellant.
Matthew Van Houten, District Attorney, Ithaca (Daniel Johnson of counsel), for respondent.



MEMORANDUM AND ORDER
Lynch, J.P.
Appeal from a judgment of the County Court of Tompkins County (Rowley, J.), rendered April 15, 2016, upon a verdict convicting defendant of the crimes of strangulation in the second degree and theft of services.
In September 2015, defendant was charged by indictment with strangulation in the second degree, attempted assault in the second degree and theft of services. The charges stemmed from a May 2015 altercation between defendant and the victim, a cab driver who agreed to drive defendant from the bus station in the City of Binghamton, Broome County to the Town of Spencer, Tioga County. As defendant had no money to pay the $120 cab fare, the cab driver took defendant's eyeglasses, purportedly as collateral. It was alleged that defendant fought and choked the cab driver, recovered his eyeglasses and ran into nearby woods. After a jury trial, defendant was convicted of strangulation in the second degree and theft of services. Defendant now appeals.
Initially, we reject defendant's claim that the jury's verdict was against the weight of the evidence. Strangulation in the second degree is established when a person, "with intent to impede the normal breathing or circulation of the blood of another person, . . . applies pressure on the throat or neck of such person" and, in doing so, "causes stupor . . . for any period of time, or any other physical injury or impairment" (Penal Law §§ 121.11 [a]; 121.12; see People v Haardt, 129 AD3d 1322, 1323 [2015]). Relevant here, a person is guilty of theft of services, when, "[w]ith intent to obtain . . . taxi . . . service without payment of the lawful charge therefor, or to avoid payment of the lawful charge for such transportation service which has been rendered to him [or her], he [or she] obtains or attempts to obtain such service or avoids or attempts to avoid payment therefor by force" (Penal Law § 165.15 [3]). Our weight of the evidence review permits us to "independently assess the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" only if we can conclude, as a threshold issue, that "a different verdict would not have been unreasonable" [*2](People v Ryder, 146 AD3d 1022, 1023 [2017] [internal quotation marks and citations omitted] lv denied 29 NY3d 1086 [2017]; see People v Danielson, 9 NY3d 342, 348-349 [2007]).
The victim testified that he was waiting for fares at the Binghamton bus station when defendant approached and asked for a ride to Spencer, which was located approximately 40 miles away. After the victim called his dispatcher for a price quote, defendant assured the victim that, although he had no money and was stranded, he could pay the fare once he arrived at the destination. The victim agreed to take defendant for $100 and took defendant's eyeglasses as collateral. According to the victim, defendant fell asleep while underway, but then woke up and asked the victim to drive to the City of Ithaca, Tompkins County where, he claimed, he could retrieve his wallet at his workplace. The victim agreed to the diversion for an additional $20, but while en route, and on a remote roadway, defendant advised that they had arrived at his home and asked the victim to stop. When the victim complied and pulled to the side of the road, defendant reached around from the back seat of the cab, stretched his forearm across the victim's neck and began to choke him. When describing the struggle, the victim testified that, although he was able to scratch at defendant's forearm, "[defendant] started to win the war with choking [him] to the extent that for a moment, [his] body went limp, [his] eyes rolled back in [his] head [and] [he] had the sensation of falling backwards in [his] head." At some point during the incident, the victim backed his car into the roadway and engaged the horn to attract attention and seek help.
Defendant testified differently. He recalled drinking the equivalent of seven cans of beer prior to boarding a bus to Binghamton to meet someone who had agreed to drive him to a rehabilitation facility located in Spencer. After defendant spent his money, missed his ride and then lost his backpack containing his wallet, he retained the victim to drive him with the expectation that, once he arrived, either someone at the facility or his father would pay the fare. According to defendant, the victim initially told him the fare to Spencer would be $80, but that when they were rerouted due to construction, the victim requested an additional $20. Defendant recalled that the victim became "nervous" and "fidgety" once he learned that defendant was heading to a rehabilitation facility. Contrary to the victim's recollection, defendant testified that his eyeglasses — which were expensive and necessary for his extraordinary vision impairments — were not offered as collateral. Rather, defendant recalled that as he was discussing and showing his eyeglasses to the victim, the victim grabbed them and threw them on the dashboard. Defendant, who could no longer see, asked the victim to stop. When the victim refused, defendant falsely claimed that they had arrived at his destination. The victim pulled to the side of the road, defendant lunged for his glasses, the victim elbowed him in the ribs and defendant "bear hugged" the victim from behind. The two struggled until the victim yelled that he could not breathe. Defendant let go and ran from the cab — with his eyeglasses — into the woods, where he hid until law enforcement arrived.
In addition to this testimony, the homeowner of the house closest to where the victim pulled over testified that he heard a car horn, saw the cab in the middle of the road and called 911 when he heard the victim yelling for help. Ryan Slocum, a Tompkins County deputy sheriff, testified that he arrived at the scene in response to a 911 call to find the victim "in a pure state of panic," bleeding from his mouth and with abrasions on his neck. After the officers on the scene — including a canine officer — searched for defendant for some time, defendant emerged from the woods with his hands in the air and stated, "you're looking for me." Given the divergent testimony of the victim and defendant, an acquittal would not have been unreasonable. Deferring to the jury's apparent determination to credit the victim's testimony and reject defendant's claims that he did not intend to strangle the victim to avoid paying the $120 cab fare, together with the evidence of the injuries to the victim's neck and defendant's forearm, we find that the verdict finding defendant guilty of strangulation in the second degree and theft of services was not against the weight of the evidence (see People v Ryder, 146 AD3d at 1025; People v Myles, 58 AD3d 889, 892 [2009], lv denied 14 NY3d 890 [2010]).
Next, defendant takes issue with County Court's Sandoval ruling. Generally, "[e]vidence of prior specific criminal, vicious or immoral conduct should be admitted if the nature of such conduct or the circumstances in which it occurred bear logically and reasonably on [*3]the issue of credibility" (People v Sandoval, 34 NY2d 371, 376 [1974]; see People v Smith, 18 NY3d 588, 593 [2012]). Prior to trial, the People sought to impeach defendant with evidence of his addiction and five specific prior acts in the event that he chose to testify. County Court determined to limit the People's inquiry to permit only confirmation that on certain past occasions, defendant had become intoxicated and law enforcement intervened. During the trial, the People further sought to impeach defendant with evidence of a recorded telephone call that he had with a counselor wherein the two discussed defendant's drinking and losing his backpack prior to boarding the bus to Binghamton and incidences of defendant "blacking out" and sustaining injuries after drinking. Also during the recorded call, the counselor recalled that defendant stole a van and commented that when defendant gets intoxicated, "a flip gets switched," he becomes "unpredictable" and he behaves badly. As to this request, County Court ruled that if defendant testified, the People would be allowed to impeach defendant with relevant portions of the tape but not the counselor's commentary.
We first note that defendant failed to preserve his claim that he was denied a fair trial because County Court did not issue its Sandoval ruling until after the close of the People's case (see People v Quintana, 159 AD3d 1122, 1127-1128 [2018], lv denied 31 NY3d 1086 [2018]). Further, we are not persuaded by defendant's general challenge to the Sandoval ruling. When making such a ruling, a trial court has the discretion to "choose from several options when weighing the prejudice to a defendant's right to a fair trial against the People's right to impeach a testifying defendant's credibility" (People v Young, 115 AD3d 1013, 1014 [2014], lv denied 24 NY3d 1124 [2015]). In our view, the court did not abuse its discretion because the determination to limit the scope and nature of the evidence that could be raised during defendant's testimony properly balanced the probative value of the prior conduct against the risk of prejudice to defendant (see People v Keener, 152 AD3d 1073, 1074 [2017]; People v Mould, 143 AD3d 1186, 1188 [2016], lv denied 28 NY3d 1187 [2017]; People v Young, 115 AD3d at 1014).
Next, defendant argues that County Court erred by refusing to charge criminal obstruction of breathing or blood circulation (see Penal Law § 121.11) as a lesser included offense of strangulation in the second degree (see Penal Law § 121.12). To warrant such a charge, "[f]irst, the proposed lesser offense must be an offense of lesser grade or degree and it must be in all circumstances . . . impossible to commit the greater crime without concomitantly, by the same conduct, committing the lesser offense. Second, there must be a reasonable view of the evidence in the particular case that would support a finding that [the] defendant committed the lesser offense but not the greater" (People v Davis, 14 NY3d 20, 22-23 [2009] [internal quotation marks, emphasis, brackets and citation omitted]; see People v Grayson, 138 AD3d 1250, 1251 [2016], lv denied 27 NY3d 1132 [2016]). The People properly concede that it is impossible to commit strangulation in the second degree without also committing criminal obstruction of breathing or blood circulation. The victim described not just that defendant's forearm against his neck obstructed his breathing, but also the effects that he felt when defendant obstructed his breathing — the feeling of going limp, his eyes rolling back and the sensation of falling. We agree with the court's conclusion that there is no reasonable view of the evidence that would allow the jury to find that he committed the lesser but not the greater crime, which, as stated, includes the additional element that the obstruction causes "stupor" (Penal Law § 121.12; see People v Blim, 63 NY2d 718, 720 [1984]; People v Taylor, 163 AD3d 1275, 1277 [2018], lv denied 32 NY3d 1068 [2018]).
We also find that County Court properly charged the jury regarding the justification defense. The crux of defendant's argument is that the court erred because it should have instructed the jury to consider whether defendant's use of "physical force" (Penal Law § 35.15 [1]) rather than "deadly physical force" (Penal Law § 35.15 [2]) was justified. We are not persuaded. "'Deadly physical force' means physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury" (Penal Law § 10.00 [11]). Whether conduct constitutes deadly physical force "hinges on the nature of the risk created — i.e., its imminence or immediacy, as well as its gravity. The risk of serious injury or death and the capacity presenting to inflict the same are central to the definition, not the consequence of [a] defendant's conduct or what he [or she] intended" (People v Magliato, 68 [*4]NY2d 24, 29 [1986]). Accepting as true that defendant believed any defensive physical force was necessary under the circumstances, we agree with County Court that applying pressure and force against a victim's neck to obstruct his breathing and cause stupor constitutes "deadly physical force" for purposes of Penal Law § 35.15 (2). In any event, given the evidence, we are satisfied that even if County Court had issued the requested charge, the verdict would not have been different (see People v Jones, 3 NY3d 491, 497 [2004]).
Finally, defendant's argument that County Court failed to properly respond to a juror's purported inability to hear some portion of a witness's testimony is not preserved for our review.
Clark, Mulvey, Devine and Rumsey, JJ., concur.
ORDERED that the judgment is affirmed.